[No. B197857. Second Dist., Div. Eight. Aug. 29, 2008.]

THE UTILITY REFORM NETWORK, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
SOUTHERN CALIFORNIA EDISON COMPANY, Real Party in Interest.

## COUNSEL

Strumwasser & Woocher, Michael J. Strumwasser, Fredric D. Woocher, Beverly G. Palmer; and Robert E. Finkelstein for Petitioner.

Helen W. Yee, Dale Holzschuh and Darwin Farrar for Respondent.

No appearance for Real Party in Interest.

## OPINION

EGERTON, J.*—The Utility Reform Network (TURN) petitions for review of an order of the Public Utilities Commission (PUC) awarding TURN only part of the attorney fees it sought for participating in lawsuits about deregulation of the electrical power market in California. The PUC declined to award TURN compensation under the intervener compensation provisions of the Public Utilities Code for TURN's unsuccessful court challenge to the PUC's settlement of a lawsuit with a utility. The PUC concluded that TURN's failed litigation did not make a substantial contribution to the PUC's proceedings. Applying the required deference, we cannot say that the PUC's decision bore no reasonable relation to the purpose and language of the governing provisions of the Public Utilities Code. Nor did the PUC err in denying a multiplier. But the PUC did err in awarding TURN's outside counsel hourly rates of up to $470 per hour instead of the $550 per hour they asked for. We therefore affirm in part and reverse in part.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## FACTS AND PROCEDURAL BACKGROUND

1. *Assembly Bill No. 1890, the Early PUC Proceedings, and Our SCE Decision.*

Much of the history underlying TURN's petition for review is set forth in our earlier opinion, *Southern Cal. Edison Co. v. Public Utilities Com.* (2004) 117 Cal.App.4th 1039 [12 Cal.Rptr.3d 441] (*SCE*), as well as in *Southern California Edison Co. v. Lynch* (2002) 307 F.3d 794 (*Lynch*) and *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781 [3 Cal.Rptr.3d 703, 74 P.3d 795] (*Peevey*). To summarize: In 1996, the California Legislature passed Assembly Bill No. 1890 (1995–1996 Reg. Sess.) (Assem. Bill 1890). That legislation instituted generation competition as the basic structure of California's electric utility industry. However, utilities could freeze regulated rates for generation temporarily, so they could make changes that would allow them to recover uneconomic costs. That is, the utilities could use a transition period to pay off their generation-related costs that might become uneconomic because of competition—"stranded" or "transition" costs. Assem. Bill 1890's provision for frozen rates recognized that the regulated price of electricity is higher than the competitive market price, and this above-market price generally reflects the sunk costs of building generation facilities. Assem. Bill 1890 permitted the utilities to recover their stranded costs until the end of 2001; the frozen rates were to remain in effect until March 31, 2002, or until the utility had fully recovered its PUC-authorized costs for utility generation assets, whichever came first.

In 1999, three utilities filed applications with the PUC, proposing (a) methods for determining the end of the transition period, and (b) ratemaking mechanisms to be in place after the rate freeze ended. Over the next couple of years, extensive proceedings took place before the PUC in this posttransition ratemaking (PTR) docket. Petitioner TURN, a San Francisco consumer advocacy organization, actively participated in the PTR proceedings. The PUC issued various PTR decisions, including one that prohibited the utilities from carrying over and recovering after the rate freeze period any uneconomic costs they had not recovered during the freeze. In the course of the PTR proceedings, the PUC also adopted an accounting proposal that TURN had submitted.

Meanwhile, in November 2000, two utility companies sued the PUC's commissioners in federal court, challenging the PUC's jurisdiction to issue its PTR decisions. (See *Southern California Edison v. Lynch*, case

No. 00-12056-RSWL [C.D.Cal.]; *Pacific Gas and Electric Company v. Lynch,* case No. 00-4128 [N.D.Cal.].) The cases were consolidated in the Central District of California. TURN eventually was permitted to intervene in both cases and it actively participated in the litigation on the PUC's side.

In July 2001, TURN submitted a request to the PUC for $641,784.95 in attorney fees and costs under the intervener compensation provisions of the Public Utilities Code, sections 1801 through 1808 and 1812. (All further statutory references are to this code.) TURN's request covered its participation in the PUC's PTR proceedings as well as its six months of work defending the PUC's PTR decisions in the federal lawsuits brought by the utilities. In June 2002, the PUC awarded TURN $573,335.70 in attorney fees and costs. Southern California Edison Company (So. Cal. Edison) petitioned for a writ of review, challenging that award to the extent it compensated TURN for its federal court work.

In *SCE* we affirmed the PUC's decision awarding TURN compensation. We first noted that we are required to give considerable deference to the PUC's interpretation of the code; that interpretation " ' "should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language." ' " (*SCE, supra,* 117 Cal.App.4th at pp. 1044, 1050, quoting *Peevey, supra,* 31 Cal.4th at p. 796.) Applying that deference, we upheld the PUC's conclusion that TURN was entitled to fees for its participation in defending the PUC's decision against a court challenge. We noted that, in the intervener compensation provisions, "the Legislature authorized the PUC to compensate customers, not only for their work before the PUC, but also for 'the fees and costs . . . of obtaining judicial review' following a decision of the PUC." (*SCE, supra,* 117 Cal.App.4th at p. 1043, quoting § 1802, subd. (a).) The administrative law judge who had considered the matter had concluded that "TURN had made a substantial contribution to PUC proceedings by participating in the federal court proceedings . . . ." (*SCE, supra,* at p. 1045.) We quoted the PUC's observation that " '[i]f an intervenor cannot gain compensation to defend a [PUC] decision in which the intervenor prevailed, the intervenor's effectiveness is severely limited.' " (*Id.* at pp. 1043–1044.) We concluded that we could not say that the PUC's construction of the intervener compensation provisions bore no " ' "reasonable relation to statutory purposes and language." ' " (*Id.* at p. 1050, quoting *Peevey, supra,* 31 Cal.4th at p. 796.)

2. *The 2000–2001 Power Crisis, the PUC's Settlement with So. Cal. Edison, and TURN's Unsuccessful Court Challenge to the Settlement.*

In the first few years of the transition period, the utilities recovered much of their stranded costs. But in the summer of 2000, power procurement

prices—that is, wholesale electricity rates—rose sharply. The utilities incurred huge debts buying electricity. California's Governor declared a state of emergency. In January 2001, the Legislature called an extraordinary session to address the power crisis. In Assembly Bill No. 6X (2001–2002 1st Ex. Sess.) (Assem. Bill 6X), the Legislature amended several provisions of Assem. Bill 1890, halting at least temporarily the transition to a competitive electricity market. Although the January 2001 legislation did not "reverse all aspects of electricity deregulation, it constituted a major retrenchment from the competitive price-reduction approach of [Assem. Bill] 1890, reemphasizing instead PUC's duty and authority to guarantee that the electric utilities would have the capacity and financial viability to provide power to California consumers." (*Peevey, supra*, 31 Cal.4th at p. 793.)

In the meantime, in October 2000, two utilities petitioned the PUC to modify its decisions in the PTR docket and to allow for post-rate-freeze recovery of certain costs they had not recovered during the rate-freeze period. In January 2001, the PUC granted the utilities emergency rate relief, authorizing a temporary surcharge of 1 cent per kilowatthour. (*Application of Southern California Edison Co.* (2001) Cal.P.U.C. Dec. No. 01-01-018.) In March 2001, still finding that the utilities' "continued financial viability and ability to serve their customers has been seriously compromised by the dramatic escalation in wholesale prices," the PUC made the January increase permanent and authorized an additional 3 cents per kilowatthour increase. (*Application of Southern California Edison Co.* (2001) Cal.P.U.C. Dec. No. 01-03-082.)

Notwithstanding this rate relief, in April 2001, Pacific Gas and Electric Company filed for bankruptcy. So. Cal. Edison claimed to be facing severe financial difficulties as well and was threatening to file for bankruptcy. So. Cal. Edison said it had accumulated procurement-related liabilities and debts of somewhere between $6.3 and $6.5 billion, creating severe liquidity and credit problems for the company. (*Peevey, supra*, 31 Cal.4th at p. 791; *Lynch, supra*, 307 F.3d at p. 801.) In October 2001, the PUC and So. Cal. Edison reached a settlement of So. Cal. Edison's federal lawsuit. So. Cal. Edison agreed to dismiss the case and the PUC agreed that So. Cal. Edison could recover its stranded costs over a longer period of time. Under the settlement, So. Cal. Edison expected to recover about $3.3 billion of its more than $6.3 billion loss during the prior rate-freeze period.

TURN objected to the PUC-So. Cal. Edison settlement. However, the federal district court approved the settlement, finding it " 'adequate and fair.' " (*Peevey, supra*, 31 Cal.4th at p. 791.) TURN then appealed to the

United States Court of Appeals for the Ninth Circuit. TURN raised a number of federal and state law challenges to the settlement. First, even though earlier in the case it had litigated in federal court in support of the PUC, TURN argued in the Ninth Circuit that the *Rooker-Feldman* doctrine precluded the federal court from exercising jurisdiction in the case. (*Lynch, supra*, 307 F.3d at p. 805, citing *Rooker v. Fidelity Trust Co.* (1923) 263 U.S. 413 [68 L.Ed. 362, 44 S.Ct. 149] and *D. C. Court of Appeals v. Feldman* (1983) 460 U.S. 462 [75 L.Ed.2d 206, 103 S.Ct. 1303].) The Ninth Circuit noted, however, that the *Rooker-Feldman* doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency.

Second, TURN argued the district court should have abstained under the *Burford* doctrine. (*Lynch, supra*, 307 F.3d at p. 805, citing *Burford v. Sun Oil Co.* (1943) 319 U.S. 315, 332–333 [87 L.Ed. 1424, 63 S.Ct. 1098].) The Ninth Circuit concluded that the district court "did not err in declining to abstain in this case"; the "threshold requirements for the exercise of *Burford* abstention [had] not been satisfied" for two reasons: the state had not chosen to concentrate suits challenging the administrative action at issue in a particular court, and the state had expressly waived any abstention defense to So. Cal. Edison's action and consented to the stipulated judgment. (*Lynch, supra*, 307 F.3d at p. 806.)

Third, the Ninth Circuit held that the district court had not exceeded its authority by approving the stipulated settlement without TURN's consent, noting that "[a]n intervenor does not have the right to prevent other parties from entering into a settlement agreement." (*Lynch, supra*, 307 F.3d at pp. 806–807, citing *Firefighters v. Cleveland* (1986) 478 U.S. 501, 528–529 [92 L.Ed.2d 405, 106 S.Ct. 3063].) Fourth and fifth, the Ninth Circuit concluded that the district court's approval of the settlement did not deny TURN due process or violate the Tenth Amendment. (*Lynch, supra*, 307 F.3d at pp. 807–809.) In sum, the federal appellate court rejected all of TURN's arguments based on federal statutory and constitutional law. However, the court found a "serious question [existed] of whether the agreement between the [PUC] and [So. Cal. Edison] violated state law, both in substance and in the procedure by which the [PUC] agreed to it." (*Id.* at p. 809.) The Ninth Circuit therefore certified three questions of state law to the California Supreme Court. (*Id.* at p. 813.)

The matter then was briefed and argued before the California Supreme Court. In a decision issued August 21, 2003, the high court ruled against

TURN on all issues. (*Peevey, supra,* 31 Cal.4th 781.) The court first noted that the "PUC's authority derives not only from statute but from the California Constitution, which creates the agency and expressly gives it the power to fix rates for public utilities." (*Id.* at p. 792, citing Cal. Const., art. XII, §§ 1, 6.) Adhering to these constitutional provisions, the court said, it has described the PUC as " ' "a state agency of constitutional origin with far-reaching duties, functions and powers" ' whose ' "power to fix rates [and] establish rules" ' has been ' "liberally construed." ' [Citation.]" (*Peevey, supra,* 31 Cal.4th at p. 792.) So, the court observed, "[i]f PUC lacked substantive authority to propose and enter into the rate settlement agreement at issue here, it was not for lack of inherent authority, but because this rate agreement was barred by some specific statutory limit on PUC's power to set rates." (*Ibid.*)

Addressing each issue in turn, the Supreme Court first rejected TURN's contention that the settlement violated section 368, enacted as part of Assem. Bill 1890. Section 368 provided only that the freeze rates would remain in effect until the earlier of March 31, 2002, or the date on which a utility had fully recovered its costs for utility generation-related assets. Section 368 did "not dictate that rates be reduced, or changed in any way, at the end of the freeze period." (*Peevey, supra,* 31 Cal.4th at p. 792.) Moreover, the court concluded, "contrary to TURN's contentions, that after the enactment of Assembly Bill 6X in 2001, which required electrical utilities to retain their generating plants until at least 2006 and returned retained generating-asset rates to cost-based regulation, PUC was authorized to approve rates allowing [So. Cal. Edison] to recover the costs covered by the settlement agreement." (*Id.* at p. 793.) The court further observed that the costs slated for recovery by the settlement agreement, on their face, were not stranded costs: the settlement agreement provided for postfreeze recovery of energy procurement, rather than generation, costs. (*Ibid.*) And, in any event, Assem. Bill 6X "largely eliminated the category of 'uneconomic' generating asset costs, the only costs whose recovery is limited under section 368." (31 Cal.4th at p. 795.) On the first issue, the Supreme Court concluded, "Whether we regard the costs to be recovered under the PUC-[So. Cal. Edison] settlement as procurement costs or as generation-related costs, . . . they were not *uneconomic* costs restricted in recovery by section 368. Consequently, PUC's agreement to the settlement was not in violation of [Assem. Bill] 1890." (*Id.* at p. 796.)

The second issue certified by the Ninth Circuit was whether the process by which the PUC settled with So. Cal. Edison violated the Bagley-Keene Open Meeting Act (Gov. Code, §§ 11121, 11121.1, 11126, subd. (d)). (*Peevey, supra,* 31 Cal.4th at p. 797.) The Supreme Court concluded that it did not. The court noted that the PUC "strictly followed the procedure mandated in Government Code section 11126.3, subdivision (a)." (*Id.* at p. 801.) The court held that the

Government Code "authorized PUC not only to discuss, but also to conclude the settlement in closed session." (31 Cal.4th at p. 797.)

The third question was whether the settlement violated section 454 by altering utility rates without a public hearing and the issuance of findings. Again, the Supreme Court said the answer was no. (*Peevey, supra,* 31 Cal.4th at p. 804.) The court again noted that, under the settlement, the PUC agreed to maintain So. Cal. Edison's approved rates for a time, not to change them. (*Id.* at p. 805.) Nor did any other regulatory actions provided for in the agreement change rates. So, the court concluded, section 454 did not apply. (31 Cal.4th at p. 805.)

In light of the California Supreme Court's resolution of the state law questions, the Ninth Circuit then entered a final judgment affirming the district court. (*Southern California Edison Co. v. Lynch* (9th Cir. 2003) 353 F.3d 648.)

### 3. *TURN's Second Request for Compensation and the PUC's Decision.*

In June 2004, TURN submitted a request for compensation to the PUC. TURN sought more than $1.9 million for part of the federal court litigation not included in its earlier request, for its work related to our decision in *SCE,* and for its unsuccessful challenge to the So. Cal. Edison settlement in federal court and in the California Supreme Court. TURN asked that its outside counsel be compensated at the same rates as those requested by Pacific Gas and Electric Company's outside counsel in the bankruptcy litigation. TURN also asked for a multiplier of 1.5 (and argued that a multiplier of 2 would be justified) because of the nature and quality of the work and the risk of nonrecovery.

In November 2004, an administrative law judge issued a proposed decision that would have awarded TURN a little over $1 million. The administrative law judge recommended that the PUC compensate TURN for its challenges to the So. Cal. Edison settlement. However, he rejected TURN's request for a multiplier and for the requested hourly rates. In March 2005, PUC Commissioner Geoffrey F. Brown issued an alternate proposed decision. He would have granted TURN about $288,000. Commissioner Brown recommended against compensating TURN for its challenges to the So. Cal. Edison settlement.

In April 2005, the PUC issued a decision awarding TURN $389,119.68 (in addition to the $573,335.70 it previously had received, bringing the total for TURN's participation in the PTR proceedings and related litigation to

$962,455.38). The PUC denied compensation for TURN's unsuccessful challenges to the So. Cal. Edison settlement. TURN sought rehearing. In March 2007, the PUC denied rehearing but modified its decision in several respects. The PUC concluded that TURN was not entitled to compensation for its challenges in the federal courts and the California Supreme Court to the So. Cal. Edison settlement because those efforts did not make a "substantial contribution" to a PUC decision.

The PUC recognized that the intervener compensation provisions authorize compensation for work associated with obtaining judicial review and that—as this court explained in *SCE*—those efforts almost always will occur after the substantial contribution to a PUC decision has been made. But the PUC concluded that a customer's post-PUC court efforts must somehow contribute to the preservation of that decision, or must result in a new decision—for example, where a customer successfully challenges a PUC decision. Here, although TURN had made a substantial contribution to the initial rate stabilization decisions, the PUC had "changed its position on the issues to which TURN had contributed earlier." "Therefore, in the judicial review of the settlement, TURN was in a position where it no longer had a substantial contribution to the Rate Stabilization Decisions that could be preserved." Moreover, "[i]f an intervenor does not succeed in its court challenge against the Commission, there will be no substantial contribution to a Commission action that is either created or preserved." The PUC rejected TURN's suggestion that "an intervenor is entitled to compensation in all cases where it participates in judicial review concerning a proceeding in which it contributed . . . ." In short, TURN no longer had a substantial contribution to the PUC's position to preserve, and it failed in its efforts in state and federal courts to challenge the PUC. So, the PUC concluded, neither the intervener compensation provisions nor the *SCE* decision provided for intervener compensation eligibility on these facts.

## THE INTERVENER COMPENSATION PROVISIONS

As did SCE's petition, TURN's current petition involves the interpretation of the intervener compensation provisions of the code. Those provisions authorize the PUC to award compensation to consumers and groups who make substantial contributions to PUC decisions. Section 1801 provides, "The purpose of this article is to provide compensation for reasonable advocate's fees, reasonable expert witness fees, and other reasonable costs to public utility customers of participation or intervention in any proceeding of the commission." Section 1801.3 provides, in part,

"It is the intent of the Legislature that:

"(a) The provisions of this article shall apply to all formal proceedings of the commission involving electric . . . utilities.

"(b) The provisions of this article shall be administered in a manner that encourages the effective and efficient participation of all groups that have a stake in the public utility regulation process. [¶] . . . [¶]

■ "(d) Intervenors be compensated for making a substantial contribution to proceedings of the commission, as determined by the commission in its orders and decisions." So, to be eligible for compensation, the statute requires that the customer have made a "substantial contribution" to the PUC's proceedings, as the PUC determines. " 'Substantial contribution' means that, in the judgment of the commission, the customer's presentation has substantially assisted the commission in the making of its order or decision because the order or decision has adopted in whole or in part one or more factual contentions, legal contentions, or specific policy or procedural recommendations presented by the customer. Where the customer's participation has resulted in a substantial contribution, even if the decision adopts that customer's contention or recommendations only in part, the commission may award the customer compensation for all reasonable advocate's fees, reasonable expert fees, and other reasonable costs incurred by the customer in preparing or presenting that contention or recommendation." (§ 1802, subd. (i).)

■ The Legislature authorized the PUC to compensate customers not only for their work before the PUC, but also for "the fees and costs . . . of obtaining judicial review" following a PUC decision. (§ 1802, subd. (a) [defining "compensation" as "payment for all or part, as determined by the commission, of reasonable advocate's fees . . . and other reasonable costs of preparation for and participation in a proceeding, and includes the fees and costs of obtaining an award under this article and of obtaining judicial review, if any"].)

In *SCE*, we considered whether the statutory provision authorizing the PUC to award compensation for the costs of "obtaining judicial review" permitted the PUC to give fees to a customer who intervenes in a judicial proceeding to assist the PUC in defending a PUC decision (for example, when—as in that case—a utility challenges a PUC decision). We concluded that the PUC may compensate such a customer, whether the litigation took place in federal or state court. We discussed the relationship between an intervener's work in defending a PUC decision and the "substantial contribution" requirement in section 1801.3, subdivision (d). We said, "[So. Cal. Edison] claims [that] TURN's federal court work could not have made a substantial contribution to the PUC decisions because the federal court work was performed *after* the PUC issued those decisions. [¶] It is true, as [So.

Cal. Edison] notes, that the Intervenor Compensation Provisions were designed to compensate customers who make a 'substantial contribution' to PUC proceedings. (§ 1801.3, subd. (d).) Indeed, making a substantial contribution is a prerequisite to an award of compensation. (§ 1803.) However, once a customer makes such a contribution to a PUC proceeding, that customer may obtain compensation for the fees and costs of obtaining judicial review, regardless whether that judicial review work made a substantial contribution to the PUC proceeding. Any contrary construction would render the judicial review clause of section 1802, subdivision (a), meaningless in most cases because such review virtually always occurs *after* the PUC has issued its decision." (*SCE, supra*, 117 Cal.App.4th at pp. 1052–1053.)

## STANDARD OF REVIEW

This court has jurisdiction to review the PUC's decisions under section 1756, subdivision (a); it authorizes any aggrieved party to petition for review in the Court of Appeal. Section 1757 provides that the Court of Appeal's review "shall not extend further than to determine, on the basis of the entire record . . . whether any of the following occurred:

"(1) The commission acted without, or in excess of, its powers or jurisdiction.

"(2) The commission has not proceeded in the manner required by law.

"(3) The decision of the commission is not supported by the findings.

"(4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record.

"(5) The order or decision of the commission was procured by fraud or was an abuse of discretion.

"(6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a)(1)–(6).)

As our Supreme Court has emphasized, and as we reiterated in *SCE*, "the 'PUC's interpretation of the Public Utility Code "should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language." ' " (*SCE, supra*, 117 Cal.App.4th at pp. 1044, 1047, quoting *Peevey, supra*, 31 Cal.4th at p. 796.)

## DISCUSSION

A. *The PUC's Decision Denying TURN Compensation for Its Unsuccessful Court Challenges Bears a Reasonable Relation to Statutory Purposes and Language.*

In its petition for review, TURN first asserts that the PUC erred in declining to give it compensation for its unsuccessful challenges in federal court and the California Supreme Court to the PUC's settlement with So. Cal. Edison. We find no error.

TURN relies heavily on our statement in *SCE* that, "once a customer makes [the required substantial] contribution to a PUC proceeding, that customer may obtain compensation for the fees and costs of obtaining judicial review, regardless whether that judicial review work made a substantial contribution to the PUC proceeding." (*SCE, supra,* 117 Cal.App.4th at pp. 1052–1053.) But this language must be read in the context of our discussion on that point. Neither the statutory language nor our interpretation of it gives entities like TURN carte blanche to do whatever they wish once they have made some sort of contribution to a PUC decision—at least not if they intend to seek to recover their fees. TURN's proposed construction of the statute and *SCE* would require compensation for any and all later court work once an intervener has made a contribution to any part of a proceeding, regardless of the value of the court work or whether intervening events have changed the original contribution. TURN's interpretation would mean that the commission's finding of a substantial contribution then would entitle an intervener to pursue endless court challenges with guaranteed compensation from ratepayers, regardless of the subject matter, value, merits, or outcome of the court challenge. Indeed, if TURN's position were adopted, it could have the unintended consequence of making the PUC reluctant to make substantial contribution determinations, especially where the PUC adopts an intervener's position only to a limited extent. The PUC then would have to award compensation if the intervener chose to make a court challenge to the PUC's decision, even if that court challenge were unsuccessful.

■ Here, TURN substantially contributed to the early phases of the PTR proceedings in the PUC and to the PUC's efforts to defend its decisions against So. Cal. Edison's challenge in federal court. The PUC awarded TURN nearly $600,000 for that work. But—some four years after the Legislature passed Assem. Bill 1890—wholesale power prices unexpectedly skyrocketed. The Governor, the Legislature, and the PUC faced a significant crisis, and they pursued what they perceived to be necessary measures to protect the public. In emergency session, the Legislature repealed much of Assem. Bill 1890. TURN argues that—notwithstanding all of these developments—the PUC could not change course or settle the lawsuit So. Cal.

Edison brought. TURN was free to argue that position in the PUC and in court. But it is not entitled, as a matter of law, to an award of compensation for pursuing a position that the PUC, two federal courts, and the California Supreme Court rejected. In short, there was no error in the PUC's determination that the intervener compensation provisions do not *require* it to award compensation for any and all judicial proceedings that ensue after an intervener's contribution in an earlier stage of a PUC proceeding. That construction of the statute " 'bear[s] a reasonable relation to statutory purposes and language,' " and we therefore will not disturb it. (*SCE, supra*, 117 Cal.App.4th at pp. 1044, 1047.) Nor can we disturb the PUC's judgment that, in this case, TURN's appellate litigation did not result in a substantial contribution to the PUC's proceedings.

Our conclusion does not mean that an intervener who does not prevail in judicial review proceedings challenging the PUC is never entitled to compensation for those efforts. We are not prescient, nor is the PUC, and the question whether an intervener's participation "has resulted in a substantial contribution" requires a case-by-case analysis. Unsuccessful appellate litigation efforts challenging the PUC might be found, under some circumstances, to have made a substantial contribution to proceedings of the PUC. (Both the PUC and TURN observe that the PUC has found a "substantial contribution" to proceedings before the PUC where an unsuccessful intervener has provided a unique perspective adding to the PUC's understanding of a complex proceeding.) In the end, the critical factor is not whether the intervener's position is for or against the PUC's position; it is whether the intervener has assisted the PUC in carrying out its statutory mandate to regulate public utilities in the public interest. In this case, we confirm only that a substantial contribution to a PUC decision, for which an intervener has been compensated, does not automatically entitle that intervener to compensation for all ensuing judicial proceedings without regard to changed circumstances or results achieved. If the Legislature's intention were otherwise, it of course may clarify the statute accordingly.

### B. *The PUC's Determination of Hourly Rates for TURN's Outside Counsel Was an Abuse of Discretion.*

TURN's June 2004 request for compensation asked for $1,935,013 (in addition to the $573,335.70 it already had been awarded). The 2004 request consisted of a "base amount" of $1,342,388 and a multiplier of 50 percent that would add $592,625 to the base amount. TURN's request included fees for both its in-house counsel and its outside counsel.

In its April 2005 decision, the PUC noted that the declarations TURN had submitted did not support all of the hours for which it was requesting fees. As

discussed above, the PUC also declined to award TURN compensation for its unsuccessful postsettlement litigation in the courts. The PUC—consistent with its customary practice—also denied TURN fees for media-related work and lobbying.

The PUC otherwise granted the request, approving to a large extent the hourly rates TURN requested for its lawyers. The PUC approved the requested rates for TURN's in-house attorneys. Those rates ranged from $350 to $435 per hour (rising each year from 2001 to 2003) for Michael P. Florio; from $310 to $395 per hour for Robert E. Finkelstein; from $350 to $385 per hour (2001–2002 only) for Randy Wu; and from $190 to $200 per hour (2001–2002 only) for Matthew Freedman. The PUC approved a rate of $95 per hour for TURN Law Clerk Hayley Goodson, rather than the $100 to $125 per hour requested.

TURN requested rates for its outside counsel, Strumwasser & Woocher, of $459 to $550 per hour for Michael J. Strumwasser and Fredric D. Woocher; of $333 to $375 per hour for Johanna Shargel; and of $225 to $295 per hour for junior associates. The PUC approved rates for Strumwasser and Woocher at the same level as those for Florio ($350/hour to $470/hour); for Shargel at the same level as those for Freedman ($190/hour to $200/hour); and of $170 to $190 per hour for the junior associates. In its petition here, TURN argues that the PUC erred in declining to approve rates for its outside counsel that were the same as those requested by one of the utilities' law firms from a federal bankruptcy court.

As noted, under the standards set forth in section 1757, subdivision (a), we are to determine whether the PUC acted contrary to a statute or to the California or federal Constitution, in excess of its jurisdiction, as a result of fraud, or in abuse of its discretion. We also are to determine whether findings support the PUC's decision and, in turn, whether substantial evidence in light of the whole record supports those findings. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2005) 128 Cal.App.4th 1, 10 [26 Cal.Rptr.3d 700].)

The starting point is section 1806. It provides: "The computation of compensation awarded pursuant to section 1804 shall take into consideration the market rates paid to persons of comparable training and experience who offer similar services. The compensation awarded may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater, to persons of comparable training and experience who are offering similar services." The PUC says that—in approving rates for TURN's outside counsel—it did in fact take into consideration the market rates paid to persons of comparable training and experience who offer similar services. However, the PUC concluded that TURN had not

shown that its outside counsel's expertise was so specialized that rates higher than the approved rates of up to $470 per hour were warranted. The PUC—citing its "Of Counsel Survey"—noted that the rates it approved for TURN's outside counsel were "well within the range for practitioners with a comparable amount of experience."

We conclude the PUC abused its discretion and failed to act in a manner consistent with section 1806's directive when it compensated TURN's outside counsel at the same rate it compensated TURN's in-house counsel. Section 1806 requires the PUC to "take into consideration the market rates paid to persons . . . who offer similar services." Outside counsel experienced in federal trial and appellate litigation offer different services than do TURN's in-house staff who are expert in administrative litigation before the PUC. The PUC acknowledges, but inexplicably rejects as "unpersuasive," TURN's evidence supporting the rates it requested for its outside counsel: the hourly rate of Pacific Gas and Electric Company's lead counsel; rates established in the "Of Counsel Survey"; and the rates charged to outside counsel's fee-paying clients. Instead, it insists it may compensate outside counsel " 'on the same basis of experience and training as we compensate practitioners before this Commission.' " The PUC's rejection of TURN's evidence fails to comply with the statutory directive to consider the market rates "paid to persons of comparable training and experience *who offer similar services.*" (§ 1806, italics added.) Certainly the PUC has, as it states, "wide discretion in determining what the market rate should be based on the evidence in the record." But it cannot ignore the unrebutted evidence in the record, and set a market rate that does not account for the difference in services offered by outside counsel experienced in federal trial and appellate litigation and those offered by practitioners before the PUC. Accordingly, we will remand the matter to the PUC for recalculation of the compensation awarded to TURN's outside counsel based on evidence in the record before the PUC of market rates paid to outside counsel.

C.   *The PUC's Denial of a Multiplier Was Not Unsupported or Unlawful.*

TURN requested a multiplier of 1.5 or 2. The PUC declined to award a multiplier. The PUC noted that, "[a]s a matter of policy, [it] exercise[s] restraint in enhancing hourly rates, and grant[s] enhancements only in exceptional cases." The PUC did not consider the issue raised in *SCE*— "whether an intervenor can be compensated for its participation in judicial review"—"to be exceptionally complex, either legally or technically, or [to require] exceptional litigation skill." Applying the standards of section 1757, we find no error.

## DISPOSITION

California Public Utilities Commission Decision No. 05-04-049, as modified by Decision No. 07-03-017, is reversed to the extent it awards compensation for TURN's outside counsel based on the same rates at which staff counsel were compensated, and is otherwise affirmed. The cause is remanded to the PUC for recalculation of the compensation awarded based on evidence in the record before the PUC of market rates paid to outside counsel. The parties shall bear their own costs.

Cooper, P. J., and Rubin, J., concurred.

Petitioner's petition for review by the Supreme Court was denied December 10, 2008, S167316. Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.